**THE LAW OFFICE OF JACK FITZGERALD, PC**
JACK FITZGERALD (SBN 257370)
*jack@jackfitzgeraldlaw.com*
TREVOR M. FLYNN (SBN 253362)
*trevor@jackfitzgeraldlaw.com*
MELANIE PERSINGER (SBN 275423)
*melanie@jackfitzgeraldlaw.com*
Hillcrest Professional Building
3636 Fourth Avenue, Suite 202
San Diego, California 92103
Phone: (619) 692-3840
Fax: (619) 362-9555

**SACKS WESTON DIAMOND, LLC**
ANDREW SACKS (*phv to be filed*)
*asacks@sackslaw.com*
JOHN WESTON (*phv to be filed*)
*jweston@sackslaw.com*
1845 Walnut Street, Suite 1600
Philadelphia, Pennsylvania 19103
Phone: (215) 764-3008

*Counsel for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHANA BECERRA, on behalf of herself, all others similarly situated, and the general public,<br><br>        Plaintiff,<br><br>                v.<br><br>DR. PEPPER SNAPPLE GROUP, INC.,<br><br>        Defendant. | Case No.: 17-cv-5921<br><br>CLASS ACTION<br><br>**COMPLAINT FOR VIOLATIONS OF CALIFORNIA'S FALSE ADVERITSING LAW, CONSUMERS LEGAL REMEDIES ACT, & UNFAIR COMPETITION LAW; AND BREACH OF EXPRESS & IMPLIED WARRANTIES**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Shana Becerra, on behalf of herself, all others similarly situated, and the general public, by and through her undersigned counsel, hereby brings this action against Dr. Pepper Snapple Group, Inc. ("DPSG"), and alleges the following upon her own knowledge, or where she lacks personal knowledge, upon information and belief including the investigation of her counsel.

## INTRODUCTION

1.     DPSG's popular beverage, Diet Dr. Pepper, is sweetened with aspartame, a non-caloric sweetener, rather than sugar. Because of the product's use of the term "diet," and its lack of calories, consumers reasonably believe that drinking Diet Dr. Pepper will assist in weight loss or management.

2.     Scientific evidence demonstrates this is wrong because nonnutritive sweeteners like aspartame interfere with the body's ability to properly metabolize calories, leading to weight gain and increased risk of metabolic disease, diabetes, and cardiovascular disease.

3.     Accordingly, DPSG's marketing Diet Dr. Pepper as "diet" is false, misleading, and unlawful.

4.     Plaintiff brings this action on behalf of herself, other Diet Dr. Pepper consumers, and the general public, to enjoin DPSG from continuing to misleadingly advertise Diet Dr. Pepper, and to recover restitution and damages for the class.

## INTRADISTRICT ASSIGNMENT

5.     Pursuant to N.D. Cal. Civ. L.R. 3-2(c), (d) & 3-5(b), this action is properly assigned to the San Francisco Division because the action arises in Sonoma County in that a substantial part of the events or omissions which give rise to plaintiff's claims occurred in Sonoma County.

## THE PARTIES

6.     Plaintiff Shana Becerra is a resident of  Santa Rosa, California.

7.     Dr. Pepper Snapple Group, Inc. is a Delaware corporation with its principal place of business at 5301 Legacy Drive, Plano, Texas 75024.

1

## JURISDICTION AND VENUE

2      8.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §

3   1332(d)(2)(A), the Class Action Fairness Act, because the matter in controversy exceeds the

4   sum or value of $5,000,000 exclusive of interest and costs, at least one member of the class

5   of plaintiffs is a citizen of a State different from DPSG.  In addition, more than two-thirds of

6   the members of the class reside in states other than the state in which Defendant is a citizen

7   and in which this case is filed, and therefore any exceptions to jurisdiction under 28 U.S.C. §

8   1332(d) do not apply.

9      9.     The Court has personal jurisdiction over DPSG pursuant to Cal. Code Civ. P. §

10  410.10, as a result of DPSG's substantial, continuous and systematic contacts with the State,

11  and because DPSG has purposely availed itself of the benefits and privileges of conducting

12  business activities within the State.

13     10.    Venue is proper in this Northern District of California pursuant to 28 U.S.C. §

14  1391(b) and (c), because DPSG resides (*i.e.*, is subject to personal jurisdiction) in this district,

15  and a substantial part of the events or omissions giving rise to the claims occurred in this

16  district.

17

## FACTS

18  **A.    Diet Dr. Pepper is Marketed to Assist in Weight Loss and Healthy Weight**

19  **Management Due to Its Non-Caloric Artificial Sweetener, Aspartame**

20     11.    DPSG uses the term "diet" in Diet Dr. Pepper, on both its label and in

21  advertising.

22     12.    Dictionary definitions of the term "diet" commonly refer to weight loss.

23     13.    DPSG uses the term "diet" to market Diet Dr. Pepper because the product is

24  sweetened with a non-caloric artificial sweetener, aspartame, rather than sugar. Because a

25  representation that a product is "diet" inherently and necessarily implies it will assist in

26  weight loss, DPSG's implicit promise is that, because Diet Dr. Pepper does not contain

27  calories, it will assist in weight loss, or at least health weight management, *i.e.*, will not cause

28  weight gain (in the same way that drinking water could not possibly result in weight gain).

14.     Due to the prominent use of the term "diet" in the product's name, Diet Dr. Pepper, consumers reasonably believe that the product will assist in weight loss, or at least healthy weight management, for example, by not causing weight gain.

**B.     Aspartame Causes Weight *Gain***

15.     Artificial, nonnutritive sweeteners were first introduced in the early 20th century, and thus humans have been consuming them for only about a century. They are typically 300 - 13,000 times sweeter than sugar.

16.     Although aspartame does not contain calories, scientific research demonstrates that it, like other nonnutritive sweeteners, is likely to cause weight gain.

17.     A 2009 review article found that the "addition of [nonnutritive sweeteners] to diet poses no benefit for weight loss or reduced weight gain without energy restriction," and noted "long-standing and recent concerns that inclusion of [nonnutritive sweeteners] in the diet promotes energy intake and contributes to obesity."[1]

18.     Another review article, in 2010, found that "[d]ata from large, epidemiologic studies support the existence of an association between artificially-sweetened beverage consumption and weight gain in children."[2]

19.     Another review article from 2010 said "research studies suggest that artificial sweeteners may contribute to weight gain."[3]

20.     A 2013 review article by a federally-funded Purdue University researcher, Susan E. Swithers, assessed differences between diet soda consumers and non-consumers among

---

[1] Mattes RD, et al., "Nonnutritive Sweetener Consumption in Humans: Effects on Appetite and Food Intake and Their Putative Mechanisms." *Am. J. Clin. Nutr.*, Vol. 89, No. 1, pp. 1-14 (Jan. 2009).

[2] Brown RJ, et al., "Artificial Sweeteners: a Systematic Review of Metabolic Effects in Youth." *Int'l J. of Ped. Obesity*, Vol. 5, No. 4, pp. 305-12 (Aug. 2010).

[3] Yang, Q., "Gain Weight by 'Going Diet?' Artificial Sweeteners and the Neurobiology of Sugar Cravings." *Yale J. of Bio. & Med.*, Vol. 83, No. 2, pp. 101-108 (June 2010) [hereinafter "Yang"].

*Becerra v. Dr. Pepper Snapple Group, Inc.*, No. 17-cv-5921
COMPLAINT

over 450,000 participants across 14 independent prospective cohort studies, with an average 16-year follow-up. Swithers found that "accumulating evidence suggests that frequent consumers of these sugar substitutes may also be at increased risk of excessive weight gain, metabolic syndrome, type 2 diabetes, and cardiovascular disease," and that "frequent consumption of high-intensity sweeteners may have the counterintuitive effect of inducing metabolic derangements." She further stated that "[r]ecent data from humans and rodent models have provided little support for [artificially sweetened beverages] in promoting weight loss or preventing negative health outcomes such as [type 2 diabetes], metabolic syndrome, and cardiovascular events. Instead, a number of studies suggest people who regularly consume [artificially sweetened beverages] are at increased risk comparted to those that do not consume [artificially sweetened beverages]," and "with the magnitude of the increased risks similar to those associated with [sugar-sweetened beverages]."[4]

21.    A 2014 study found that "consumption of commonly used [non-caloric artificial sweetener] formulations drives the development of glucose intolerance through induction of compositional and functional alterations to the intestinal microbiota," and because of this "link [between] [non-caloric artificial sweetener] consumption, symbiosis and metabolic abnormalities," found that artificial sweeteners "may have directly contributed to enhancing the exact epidemic that they themselves were intended to fight."[5]

22.    In 2015, researchers reported "a striking dose-response relationship," wherein "increasing [diet soda intake] was associated with escalating abdominal obesity, a pathway for cardiometabolic risk," and noted that "[h]igh incidences of overweight and obesity, hypertension, metabolic syndrome, diabetes mellitus, kidney dysfunction, heart attack, and

---

[4] Swithers, SE, "Artificial Sweeteners Produce the Counterintuitive Effect of Inducing Metabolic Derangements." *Trends in Endocrinology & Metab.*, Vol. 24, No. 9, pp. 431-41 (Sept. 2013).

[5] Suez J, et al., "Artificial Sweeteners Induce Glucose Intolerance by Altering the Gut Microbiota." *Nature*, pp.181-86 (Oct. 2014).

hemorrhagic stroke have all recently been associated with frequent [nonnutritive sweetener intake] and [diet soda intake]."[6]

23.    Epidemiological studies also implicate artificial sweeteners in causing weight gain. For example, the San Antonio Heart Study "observed a class, positive dose-response relationship between [artificially sweetened] beverage consumption and long-term weight gain," and found that consuming more than 21 artificially sweetened beverages per week, compared to those who consumed none, "was associated with almost-doubled risk" of overweight or obesity.[7]

24.    A study of beverage consumption among children and adolescents aged 6-19 found that "BMI is positively associated with consumption of diet carbonated beverages."[8]

25.    A two-year study of 164 children found that "[i]ncreases in diet soda consumption were significantly greater for overweight and subjects who gained weight as compared to normal weight subjects."[9]

26.    A July 2017 study found that artificial sweeteners did not lead to any significant weight loss in more than 1,000 participants in seven clinical trials. At the same time, combined data from 30 observational studies involving more than 400,000 participants

---

[6] Fowler, S, et al., "Diet Soda Intake is Associated with Long-Term Increases in Waist Circumference in a Biethnic Cohort of Older Adults: The San Antonio Longitudinal Study of Aging." *J. of the Am. Geriatrics Society* (March 17, 2015).

[7] Fowler, S, et al., "Fueling the Obesity Epidemic? Artificially Sweetened Beverage Use and Long-Term Weight Gain." *Obesity*, Vol. 16, No. 8, pp. 1894-900 (Aug. 2008).

[8] Forshee RA, et al., "Total Beverage Consumption and Beverage Choices Among Children and Adolescents." *Int'l J. of Food Sci. & Nutr.*, Vol. 54, No. 4, pp. 297-307 (July 2003); *see also* Berkey CS, et al., "Sugar-Added Beverage sand Adolescent Weight Change." *Obesity Research*, Vol. 12, No. 5, pp. 778-88 (May 2004) (in study of more than 10,000 U.S. children aged 9-14, finding, for boys, intakes of diet soda "were significantly associated with weight gains").

[9] Blum, JW, et al., "Beverage Consumption Patterns in Elementary School Aged Children Across a Two-Year Period." *J. of Am. Coll. of Nutr.*, Vol. 24, No. 2, pp. 93-98 (Apr. 2005).

showed that artificial sweeteners are associated with obesity, high blood pressure, type 2 diabetes and heart health problems.[10]

27.    A study published in August 2017 suggested artificial sweetener use increases the risk of type 2 diabetes by 21%, which is about half the increased risk seen with sugar-sweetened beverage use, at 43%.[11] Another study indicates daily diet soda consumption is associated with a 36% increase in risk of metabolic syndrome, and a 67% increase in risk of type 2 diabetes compared with non-drinkers.[12]

28.    Recent research, published in August 2017, suggests the likely mechanism of the counterintuitive effect of non-caloric sweeteners contributing to weight gain and other chronic, metabolic illness.

29.    In nature, sweetness signals energy. Generally, the greater the sweetness, the more calories that are available, so the human brain has evolved to expect the two to come together. When they do not, the brain can become confused, thinking there are fewer calories to burn. That is, artificial sweeteners, including aspartame, appear to promote weight gain, and to trigger metabolic syndrome and diabetes, because the brain misreads the number of calories present and reduces metabolism, resulting in more calories being stored in the body as fat.

30.    This recent research came about when Yale University researcher Dana Small set out to determine whether the rewarding character of sweet foods was due to the calories

---

[10] Azad, MB, et al., "Nonnutrive sweeteners and cardiometabolic health: a systematic review and meta-analysis of randomized controlled trials and prospective cohort studies." *Canadian Medical Association Journal*, Vol. 189, No. 28, pp. E929-E939 (July 17, 2017).

[11] Huang, M, et al., "Artificially sweetened beverages, sugar-sweetened beverages, plain water, and incident diabetes mellitus in postmenopausal women: the prospective Women's Health Initiative observational study." *Am. J. Clin. Nutr.*, Vol. 106, No. 2, pp. 614-22 (Aug. 2017).

[12] Nettleton, JA, et al., "Diet soda intake and risk of incident metabolic syndrome and type 2 diabetes in Multi-Ethnic Study of Artherosclerosis (MESA)." *Diabetes Care*, Vol. 32, No. 4, pp. 688-94 (Apr. 2009).

those foods contain. Small created five beverages. Each was sweetened with sucralose, an artificial sweetener, to taste about as sweet as a drink containing about 75 calories of sugar. Small then varied the calories by adding different amounts of a tasteless carbohydrate called maltodextrin, so that the five beverages contained 0, 27.5, 75, 112.5, and 150 calories. After subjects consumed each drink six times over a period of weeks, Small scanned their brains to see how each affected brain reward circuits, expecting that the higher-calorie drinks would stimulate a stronger reward response. However, the most "reinforcing" drink was the 75 calorie one, which stimulated a stronger brain response than both the 0 calorie and 150 calorie drinks.[13]

31.    This research led Small to test the body's metabolic response, which is the energy the body expends to process calories. The results repeated themselves, with the metabolic response to the high-calorie drink lower than the metabolic response to the medium-calorie drink. Thus, the researchers found that when there was a "mismatch" between sweetness and calories present, the calories present fail to trigger the body's metabolism. In addition, reward circuits in the brain did not register that calories had been consumed.[14]

32.    This research demonstrates that sweetness plays a role in how the body responds to food, inasmuch as it regulates the metabolic signal.

33.    In sum, calories consumed in a mismatched condition, such as when a person drinks a Diet Dr. Pepper while eating food, are not efficiently metabolized at the time of ingestion, and may therefore be processed later, or stored, which can drive weight gain and further interfere with metabolism.

---

[13] *See* Veldhuizen, MG, et al., "Integration of Sweet Taste and Metabolism Determines Carbohydrate Reward." *Current Biology*, Vol. 27, Issue 16, pp. 2476-85 (Aug. 2017).

[14] *See id.*

34.    In addition, some research has shown that sweetness—whether from sugar or non-caloric, artificial sources—increases appetite, which can lead to weight gain.[15] Moreover, "[i]nconsistent coupling between sweet taste and caloric content can lead to compensatory overeating and positive energy balance."[16]

## DPSG'S UNLAWFUL ACTS

**A.    DPSG Misleadingly Marketed Diet Dr. Pepper as Promoting Weight Loss or Healthy Weight Management**

35.    Because the aspartame in Diet Dr. Pepper is likely to cause weight gain, rather than to help in weight loss or healthy weight management, DPSG's marketing the product as "diet" is false and misleading.

36.    DPSG is, or reasonably should be aware, of the scientific evidence that consuming aspartame can cause weight gain. That evidence has been in the published and in the public domain, and recounted in major news outlets.

37.    Despite that DPSG is, or reasonably should have been aware that promoting Diet Dr. Pepper as "diet" was false and misleading, DPSG continued to do so anyway, because this representation is the major driver of Diet Dr. Pepper sales.

38.    Moreover, while touting Diet Dr. Pepper as "diet," and containing zero calories, DPSG deceptively omitted material information, namely that despite its lack of calories, the consumption of Diet Dr. Pepper can lead to weight gain and contribute to metabolic disease, diabetes, and cardiovascular disease.

**B.    DPSG Violated FDA and California Food Labeling Regulations**

39.    The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.* ("FDCA"), governs the labeling of foods and beverages. Pursuant to the California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code §§ 109875 *et seq.* (the "Sherman Law"),

---

[15] *See* Yang, *supra* n.3 ("Preload experiments generally have found that sweet taste, whether delivered by sugar or artificial sweeteners, enhanced human appetite.").

[16] *Id.*

California has adopted the FDCA and its implementing regulations as its own law, *see id.* § 110100.

40.   The FDCA prohibits the labeling of food that is "false or misleading in any particular," 21 U.S.C. § 343(a).

41.   FDA regulations provide that companies may use the term "diet" in the brand name or label of a soft drink described in section 343(r)(2)(D) *only* when it is not false or misleading. *See* 21 U.S.C. § 343(r)(2)(D); 21 C.F.R. § 101.13(q)(2).

42.   DPSG's labeling Diet Dr. Pepper as "diet" is false and misleading for the reasons described herein. Accordingly, DPSG has violated 21 U.S.C. §§ 343(a) and 343(r)(2)(D), 21 C.F.R. § 101.13(q)(2), and the corresponding sections of California's Sherman Law, *see* Cal. Health & Safety Code §§ 110660, 100670.

43.   In labeling Diet Dr. Pepper, DPSG also "fail[ed] to reveal facts that are material in light of other representations made or suggested by the statement[s], word[s], design[s], device[s], or any combination thereof," in violation of 21 C.F.R. § 1.21(a)(1). Such facts include that consuming the aspartame in Diet Dr. Pepper can lead to weight gain or make it difficult to maintain a healthy weight.

44.   In labeling Diet Dr. Pepper, DPSG similarly failed to reveal facts that were "[m]aterial with respect to the consequences which may result from use of the article under" both "[t]he conditions prescribed in such labeling," and "such conditions of use as are customary or usual," in violation of § 1.21(a)(2). Namely, DPSG failed to disclose the increased risk of weight gain, and of serious chronic disease, likely to result from the usual consumption of Diet Dr. Pepper in the customary manner.

## PLAINTIFF'S PURCHASE, RELIANCE, AND INJURY

45.   Plaintiff Shana Becerra has been a regular purchaser of Diet Dr. Pepper for many years. For over 13 years, plaintiff has purchased several cans of Diet Dr. Pepper each month, usually from the Safeway located at 2785 Yulupa Avenue, in Santa Rosa, California.

46.   Plaintiff has struggled with obesity since childhood. She purchased and consumed Diet Dr. Pepper in large part because she believed, based on DPSG's advertising

the product as "Diet," that it would contribute to healthy weight management, and, due to its lack of calories, would not cause her to gain weight.

47.    Plaintiff would not have purchased Diet Dr. Pepper at the price she paid, and may not have purchased it at all, absent DPSG's false, misleading, and unlawful labeling.

48.    Diet Dr. Pepper cost more than a product, represented to be a diet product, would cost if the truth were revealed that the product was not a diet product at all.

49.    If DPSG were enjoined from making the misleading claims, the market demand and price for Diet Dr. Pepper would drop, as it has been artificially and fraudulently inflated due to DPSG's use of false, misleading, and unlawful labeling.

50.    For these reasons, the Diet Dr. Pepper was worth less than what plaintiff paid for it.

51.    Instead of receiving a beverage that would help assist plaintiff in achieving and maintaining a healthy weight, plaintiff received a beverage whose consumption is likely to lead to weight gain.

52.    Plaintiff lost money as a result of DPSG's deceptive claims and unfair practices in that she did not receive what she paid for when purchasing the Diet Dr. Pepper.

53.    Plaintiff detrimentally altered her position and suffered damages in an amount equal to what she paid for the product.

54.    Plaintiff might purchase Diet Dr. Pepper in the future, for example as a treat, if the product were properly labeled.

## CLASS ACTION ALLEGATIONS

55.    Pursuant to Fed. R. Civ. P. 23, plaintiff seeks to represent a class comprised of all persons in California who, on or after October 16, 2013 purchased, for personal or household use, and not for resale, Diet Dr. Pepper in cans or bottles.

56.    Plaintiff nevertheless reserves the right to divide into subclasses, expand, narrow, or otherwise modify the class definition prior to (or as part of) filing a motion for class certification.

57.     The members in the proposed class and subclass are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of all class members in a single action will provide substantial benefits to the parties and Court. Fed. R. Civ. P. 23(a)(1).

58.     There are questions of law and fact common to the class, Fed. R. Civ. P. 23(a)(2), which plaintiff may seek to litigate on an individual basis pursuant to Fed. R. Civ. P. 23(c)(4), including without limitation:

    a.     Whether Diet Dr. Pepper sold during the class period was likely to result in weight gain, or increased risk of metabolic disease, diabetes, and cardiovascular disease;

    b.     Whether advertising Diet Dr. Pepper as "diet" would be likely to deceive a reasonable consumer;

    c.     Whether Diet Dr. Pepper sold during the class period was misbranded because it was in violation of any FDA or California state food labeling statute or regulation;

    d.     Whether DPSG expressly or impliedly warranted that Diet Dr. Pepper was "diet";

    e.     Whether DPSG impliedly warranted that Diet Dr. Pepper would assist in weight loss or healthy weight management;

    f.     Whether DPSG breached any express or implied warranties;

    g.     The proper injunctive or prospective relief; and

    h.     The proper amount of reasonable litigation expenses and attorneys' fees.

59.     Plaintiff's claims are typical of class members' claims in that they are based on the same underlying facts, events, and circumstances relating to DPSG's conduct.

60.     Plaintiff will fairly and adequately represent and protect the interests of the class, has no interests incompatible with the interests of the class, and has retained counsel competent and experienced in class action litigation, including within the food and beverage industry.

61.    Class treatment is superior to other options for resolution of the controversy because the relief sought for each class member is small such that, absent representative litigation, it would be infeasible for class members to redress the wrongs done to them.

62.    Questions of law and fact common to the class predominate over any questions affecting only individual class members.

63.    As a result of the foregoing, class treatment is appropriate under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), and may be appropriate for certification "with respect to particular issues" under Rule 23(c)(4).

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### VIOLATIONS OF THE CALIFORNIA FALSE ADVERTISING LAW,

### CAL. BUS. & PROF. CODE §§ 17500 *ET SEQ.*

64.    Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if fully set forth herein.

65.    The FAL prohibits any statement in connection with the sale of goods "which is untrue or misleading," Cal. Bus. & Prof. Code § 17500.

66.    DPSG's use of the term "diet" in marketing Diet Dr. Pepper is deceptive in light of the strong evidence that aspartame causes weight gain.

67.    DPSG knew, or reasonably should have known, that marketing Diet Dr. Pepper as "diet" was untrue or misleading.

### SECOND CAUSE OF ACTION

### VIOLATIONS OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT,

### CAL. CIV. CODE §§ 1750 *ET SEQ.*

68.    Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if fully set forth herein.

69.    The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

*Becerra v. Dr. Pepper Snapple Group, Inc.*, No. 17-cv-5921
COMPLAINT

70.     DPSG's policies, acts, and practices were designed to, and did, result in the purchase and use of the Diet Dr. Pepper primarily for personal, family, or household purposes, and violated and continue to violate the following sections of the CLRA:

      a.     § 1770(a)(5): representing that goods have characteristics, uses, or benefits which they do not have;

      b.     § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another;

      c.     § 1770(a)(9): advertising goods with intent not to sell them as advertised; and

      d.     § 1770(a)(16): representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

71.     Plaintiff, on behalf of herself and the class, seeks injunctive relief, restitution, and reasonable attorneys' fees and costs.

72.     In compliance with Cal. Civ. Code § 1782, plaintiff sent written notice to DPSG of her claims. Although plaintiff does not currently seek damages for her claims under the CLRA, if DPSG refuses to remedy the violation within 30 days of receiving the notice letter, plaintiff may thereafter amend this Complaint to seek actual and statutory damages.

73.     In compliance with Cal. Civ. Code § 1782(d), an affidavit of venue is filed herewith.

### THIRD CAUSE OF ACTION

### VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW,

### CAL. BUS. & PROF. CODE §§ 17200 *ET SEQ.*

74.     Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if fully set forth herein.

75.     The UCL prohibits any "unlawful, unfair or fraudulent business act or practice," Cal. Bus. & Prof. Code § 17200.

**Fraudulent**

76.     DPSG's use of the term "diet" to market Diet Dr. Pepper is likely to deceive reasonable consumers.

**Unfair**

77.     DPSG's conduct with respect to the labeling, advertising, and sale of Diet Dr. Pepper was and is unfair because DPSG's conduct was and is immoral, unethical, unscrupulous, or substantially injurious to consumers and the utility of its conduct, if any, does not outweigh the gravity of the harm to its victims.

78.     DPSG's conduct with respect to the labeling, advertising, and sale of Diet Dr. Pepper was also unfair because it violated public policy as declared by specific constitutional, statutory or regulatory provisions, including the False Advertising Law, the Federal Food, Drug, and Cosmetic Act, and the California Sherman Food, Drug, and Cosmetic Law.

79.     DPSG's conduct with respect to the labeling, advertising, and sale of Diet Dr. Pepper was also unfair because the consumer injury was substantial, not outweighed by benefits to consumers or competition, and not one consumers themselves could reasonably have avoided.

**Unlawful**

80.     The acts alleged herein are "unlawful" under the UCL in that they violate at least the following laws:

    a.     The False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*;

    b.     The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*; and

    c.     The Federal Food, Drug, and Cosmetic Act, 28 U.S.C. §§ 301 *et seq.*, and its implementing regulations, 21 C.F.R. §§ 101 *et seq.*; and

    d.     The California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code §§ 109875, *et seq.*

**FOURTH CAUSE OF ACTION**

**BREACH OF EXPRESS WARRANTY, CAL. COM. CODE § 2313(1)**

81.    Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if fully set forth herein.

82.    Through the label of Diet Dr. Pepper, DPSG made affirmations of fact or promises, and made descriptions of goods, that formed part of the basis of the bargain, in that plaintiff and the class purchased the Diet Dr. Pepper in reasonable reliance on those statements. Cal. Com. Code § 2313(1).

83.    Specifically, DPSG made statements that Diet Dr. Pepper is "diet."

84.    DPSG breached its express warranties by selling products that are not "diet," *i.e.*, do not assist in weight loss or healthy weight management, but which in fact cause weight gain.

85.    That breach actually and proximately caused injury in the form of the lost purchase price that plaintiff and class members paid for the Diet Dr. Pepper.

86.    Plaintiff gave DPSG notice of the breach before filing or asserting the claim, but DPSG failed to remedy the breach.

87.    As a result, plaintiff seeks, no behalf of herself and other class members, actual damages arising as a result of DPSG's breach of express warranty.

**FIFTH CAUSE OF ACTION**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY,**

**CAL. COM. CODE § 2314**

88.    Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if fully set forth herein.

89.    DPSG, through its acts and omissions set forth herein, in the sale, marketing and promotion of Diet Dr. Pepper, made representations to plaintiff and the class that Diet Dr. Pepper would assist in weight loss or health weight management, and would not contribute to weight gain.

15

90.    DPSG is a merchant with respect to the goods of this kind which were sold to plaintiffs and the class, and there was, in the sale to plaintiffs and other consumers, an implied warranty that those goods were merchantable.

91.    However, DPSG breached that implied warranty in that Diet Dr. Pepper does not contribute to weight loss or healthy weight management, and instead contributes to weight gain, as set forth in detail herein.

92.    As an actual and proximate result of DPSG's conduct, plaintiff and the class did not receive goods as impliedly warranted by DPSG to be merchantable in that they did not conform to promises and affirmations made on the container or label of the goods.

93.    Plaintiff gave DPSG notice of the breach before filing or asserting the claims, but DPSG failed to remedy the breach.

94.    As a result, plaintiff seeks, on behalf of herself and other class members, actual damages arising as a result of DPSG's breaches of implied warranty.

## PRAYER FOR RELIEF

95.    Wherefore, plaintiff, on behalf of herself, all others similarly situated, and the general public, prays for judgment against DPSG as to each and every cause of action, and the following remedies:

a.    An Order certifying this action as a class action, appointing plaintiff as Class Representative, appointing her counsel as Class Counsel, and requiring DPSG to bear the cost of class notice;

b.    An Order enjoining DPSG from marketing Diet Dr. Pepper as "diet" so long as it is sweetened with a non-nutritive artificial sweetener;

c.    An Order requiring DPSG to engage in a corrective advertising campaign.

d.    An Order requiring DPSG to pay restitution to restore funds that may have been acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading advertising, or a violation of the UCL, FAL, or CLRA;

e.    An Order requiring DPSG to pay all statutory, compensatory, and punitive damages permitted under the causes of action alleged herein;

f.    An Order requiring DPSG to disgorge or return all monies, revenues, profits, or other unjust enrichment obtained by means of any wrongful or unlawful act or practice;

g.    Pre- and post-judgment interest;

h.    Costs, expenses, and reasonable attorneys' fees; and

i.    Any other and further relief as may later be requested, or which the Court deems necessary, just, or proper.

## JURY DEMAND

96.    Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: October 16, 2017            /s/ Jack Fitzgerald

**THE LAW OFFICE OF JACK FITZGERALD, PC**
JACK FITZGERALD
*jack@jackfitzgeraldlaw.com*
TREVOR M. FLYNN
*trevor@jackfitzgeraldlaw.com*
MELANIE PERSINGER
*melanie@jackfitzgeraldlaw.com*
Hillcrest Professional Building
3636 4th Ave., Ste. 202
San Diego, CA 92103
Phone: (619) 692-3840
Fax: (619) 362-9555

**SACKS WESTON DIAMOND, LLC**
ANDREW SACKS (*phv to be filed*)
*asacks@sackslaw.com*
JOHN WESTON (*phv to be filed*)
*jweston@sackslaw.com*
1845 Walnut Street, Suite 1600
Philadelphia, Pennsylvania 19103
Phone: (215) 764-3008

***Counsel for Plaintiff and the Putative Class***

17

*Becerra v. Dr. Pepper Snapple Group, Inc.*, No. 17-cv-5921
COMPLAINT