UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHANA BECERRA,<br><br>    Plaintiff,<br><br>    v.<br><br>DR PEPPER/SEVEN UP, INC.,<br><br>    Defendant. | Case No. 17-cv-05921-WHO<br><br>**ORDER GRANTING MOTION TO DISMISS**<br><br>Re: Dkt. No. 61 |

## INTRODUCTION

Plaintiff Shana Becerra alleges that she thought Diet Dr Pepper would help her lose or maintain a healthy weight because of the term "diet" in its label and the term's association with no sugar or calories. She brings this putative class action on behalf of herself and a California class of similarly-situated consumers for damages and equitable relief, and seeks an injunction to force defendant to stop marketing products as "diet." Defendant Dr Pepper/Seven Up, Inc. ("Dr Pepper") moves to dismiss the Third Amended Complaint ("TAC") in its entirety.

The TAC rests on two key factual claims: that the term "diet" communicates weight loss or weight management, and that the aspartame in diet soft drinks is likely to cause weight gain. Based on these claims, Becerra alleges that it is misleading to use the term "diet" in the "Diet Dr Pepper" brand name, and deceptive to market it as such when Diet Dr Pepper is not a weight loss or healthy weight management product.

Considering the allegations in the TAC, I still conclude it is not plausible that reasonable consumers would believe consuming Diet Dr Pepper leads to weight loss or healthy weight management absent a change in lifestyle. Becerra does not plausibly allege that the term "diet" as used in "Diet Dr Pepper" brand name is false or misleading, or that the science supports causation

between aspartame and weight gain. Dr Pepper's motion to dismiss the TAC is GRANTED without leave to amend.

**BACKGROUND**

**I.  FACTUAL BACKGROUND**

Becerra is a Santa Rosa, California resident who has struggled with obesity since childhood. *See* TAC ¶ 66. She was a regular purchaser of Diet Dr Pepper for over thirteen years and believed that the term "diet" meant the product would help her maintain a healthy weight. TAC ¶¶ 65–66. She claims that Diet Dr Pepper is not worth the price she paid for it, and that she would not have purchased it at its current price point, or perhaps at all, if it was not marketed as "diet." *Id*. ¶¶ 67–70.

Dr Pepper is a Delaware corporation with its principal place of business in Plano, Texas. TAC ¶ 7. Diet Dr Pepper was first introduced to the market in 1962. *Id*. ¶ 11. What makes the product "diet" is the presence of a non-caloric artificial sweetener, aspartame, instead of sugar. *Id*. ¶ 14. The TAC claims that aspartame in diet soft drinks like Diet Dr Pepper contributes to diabetes and does not assist with weight loss or weight maintenance. *Id*. ¶ 49. Becerra argues that the use of the term "diet" is deceptive, therefore, because diet conveys the product will not lead to weight gain when the aspartame in diet soft drinks does. Relatedly, she references several print and video advertisements that she believes shows how Dr Pepper used the term "diet" in "Diet Dr Pepper" to falsely convey it is a weight loss or weight maintenance product. *Id*. ¶¶ 17–32, 41. The TAC also includes American Beverage Association articles and a survey of diet soft drink consumers that Becerra contends is proof the vast majority of consumers expect diet soft drinks to help them lose or maintain their weight. *Id*. ¶ 42.

**II.  PROCEDURAL BACKGROUND**

On October 16, 2017, Becerra filed the original class action complaint in this case. Dkt. No. 1. She asserted claims on behalf of herself and a class of similarly situated consumers in California, alleging false and misleading advertising in violation of California's False Advertising Law ("FAL"), Consumers Legal Remedies Act ("CLRA"), and Unfair Competition Law ("UCL"), as well as breach of both express and implied warranty. Shortly after filing the initial complaint,

2

she amended the complaint to correctly identify the defendant in this action. Dkt. No. 22. On December 22, 2017, Dr Pepper moved to dismiss the first amended complaint and on January 3, 2018, filed a motion to transfer venue. Dkt. Nos. 23, 30. Becerra filed a second amended complaint on January 3, 2018, adding facts and reasserting her original consumer protection and warranty claims. Dkt. No. 27. Dr Pepper then filed a motion to dismiss the second amended complaint and that motion, along with the then-pending motion to transfer, was heard on March 28, 2018.

I issued an Order Denying Motion to Transfer and Granting Motion to Dismiss the Second Amended Complaint on March 30, 2018, and granted Becerra leave to file a TAC. Dkt. No. 54. Relevant here, my prior Order held that Becerra's claims were not expressly preempted by the Nutrition Labeling and Education Act of 1990 ("NLEA") since the state laws underlying Becerra's claims—California's UCL, FAL, CLRA, and Sherman Food, Drug, and Cosmetic Law—imposed identical requirements to the federal statute. *Id.* at 7. I also found that Becerra did not plead a plausible claim that reasonable consumers would be misled by the term "diet" in the diet soft drink context. *Id.* at 9. The scientific studies on aspartame relied on by Becerra did not save her false and misleading claims because those studies exhibited correlations but did not support plaintiff's position that aspartame causes weight gain. *Id.* at 11.

On April 30, 2018, Becerra filed her TAC against Dr Pepper. Dkt. No. 60. Dr Pepper responded with the present motion to dismiss on May 14, 2018. Dkt. No. 61. Since filing its motion, Dr Pepper also notified the court of two recent decisions pursuant to Civil Local Rule 7-3(d)(2), *Manuel v. Pepsi-Cola Co.*, No. 17 CIV. 7955 (PAE), 2018 WL 2269247 (S.D.N.Y. May 17, 2018) and *Excevarria, et al. v. Dr. Pepper Snapple Group Inc.*, et al., No. 17-cv-7957-GBD (S.D.N.Y.). *See* Dkt. Nos. 62–63.

**LEGAL STANDARD**

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible when the plaintiff pleads facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*,

3

556 U.S. 662, 678 (2009) (citation omitted).  While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.  There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id*.

To decide if the plaintiff has stated a claim upon which relief can be granted, the court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

Claims sounding in fraud or mistake are subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b), which requires that such claims "state with particularity the circumstances constituting fraud or mistake." This includes "the who, what, when, where, and how of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotation marks and citation omitted).  In fraud cases, plaintiffs "must set forth what is false or misleading about a statement, and why it is false." *Id*.  The allegations of fraud "must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007).

If the court dismisses a complaint, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).  In making this determination, the court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *See Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir. 1989).

**DISCUSSION**

Dr Pepper moves to dismiss the TAC, arguing that despite the amendments made by

4

Becerra: (i) the TAC still fails to allege facts establishing that reasonable consumers are likely to be deceived by the brand name; (ii) Becerra's claims are preempted by federal law; (iii) Becerra fails to meet the heightened pleading standards for her fraud-based claims; and (iv) the warranty claim cannot stand because "diet" as used in the brand name is not an actionable misrepresentation.

## I. EXPRESS PREEMPTION BY THE NLEA

In my Order Denying Motion to Transfer and Granting Motion to Dismiss the Second Amended Complaint, I rejected Dr Pepper's preemption argument, recognizing that because California law is consistent with and identical to the NLEA, there is no preemption of Becerra's claims. *See* Order at 5–8. On this motion, Dr Pepper argues preemption again. Dr Pepper contends that its labeling conforms with 21 C.F.R. § 101.13(q)(2), allowing manufacturers who used "diet" in their brand name before October 1989, to continue using that term in their brand name as long as "its use of the term is not false or misleading under section 403(a) of the act." Dr Pepper also contends it conforms with 21 C.F.R. § 105.66(e)(1), providing that "a food may be labeled with terms such as 'diet,' 'dietetic,' 'artificially sweetened,' or 'sweetened with nonnutritive sweetener' only if the claim is not false and misleading, and the food is labeled 'low calorie' or 'reduced calorie' or bears another comparative calorie claim . . . ."

As noted before, whether Dr Pepper's use of "diet" is false and misleading under 21 C.F.R. § 101.13(q)(2) or 21 C.F.R. § 105.66(e)(1) is the identical question raised under state law. Becerra's claim that use of "diet" in Diet Dr Pepper's brand name is false or misleading under state law does not conflict with federal law. Her claims are not preempted. *See also Becerra v. Coca-Cola Co.*, C 17-05916 WHA, 2018 WL 1070823, at *3 (N.D. Cal. Feb. 27, 2018) (rejecting preemption of identical claims); *Pepsi-Cola Co.*, 2018 WL 2269247, at *6 (same).

## II. PLAINTIFF'S CONSUMER PROTECTION CLAIMS

On the prior motion to dismiss, I dismissed the claim that "diet" on a soft drink label could lead reasonable consumers to believe Diet Dr Pepper assists with weight loss, or at least not weight gain. There were no facts or theories in the Second Amended Complaint to plausibly support that the label conveys *more* than that the drink has relatively less calories and sugar than

5

normal soft drinks. I also discussed the studies cited in the Second Amended Complaint, and explained that the problem was "the studies do not allege causation at all—at best, they support merely a correlation or relationship between artificial sweeteners and weight gain, or risk of weight gain." Order at 11.

Becerra attempts to address the deficiencies identified by adding dictionary definitions, advertisements, a consumer survey, and more articles and studies on diet soft drinks. Dr Pepper moves again to dismiss on the basis that despite the amendments Becerra still has not alleged facts establishing a reasonable consumer would be misled by the "Diet Dr Pepper" brand name, and the new studies referenced in the TAC do not support that aspartame causes weight gain. I agree. The consumer protection claims in the TAC still fail to allege facts that plausibly support that the reasonable consumer would be deceived by the "diet" label, either due to their understanding of the term "diet" or factually because aspartame causes weight gain.

### A. Becerra's Theory that Diet Dr Pepper is Deceptive Fails to Offer a Plausible Set of Facts that Could Pass the Reasonable Consumer Test

Becerra's consumer protection claims under the UCL, FAL, and CLRA are governed by the reasonable consumer test, requiring a showing "that members of the public are likely to be deceived." *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016). There must be a probability "that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Id*. (quoting *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 508 (2003)).

With regard to the reasonable consumer test, the TAC adds the following allegations: (i) specific references to dictionary definitions of the term "diet" showing that reasonable consumers expect diet products to lead to weight loss or not affect weight; (ii) a sampling of print and video advertisements for Diet Dr Pepper showing that Dr Pepper knew marketing and use of the term "diet" was deceptive; (iii) American Beverage Association articles suggesting that diet soft drinks can help with weight loss goals; and (iv) a survey of California and nationwide consumers regarding their understanding of the impact "diet" soft drinks have on their weight. After analyzing each of these new factual allegations, the result does not change. Becerra has not

pleaded a plausible claim that reasonable consumers would be deceived by the use of "diet" in the Diet Dr Pepper label.

### 1. Dictionary Definitions

The TAC introduces eight dictionary definitions of "diet" that were not in the previous complaint, to show how reasonable consumers would purportedly interpret the term and be misled by it. TAC ¶ 13. These dictionary sources associate "diet" with losing weight, limiting food intake, or preventing disease. *Id*. Dr Pepper disagrees that reasonable consumers could interpret the term as associated with weight loss. In response, Becerra correctly notes "the question is how a reasonable consumer would interpret the phrase [] in the context of the specific commercial interaction that Plaintiff has challenged." *Delman v. J. Crew Grp., Inc.*, No. CV 16-9219-MWF (ASX), 2017 WL 3048657, at *7 (C.D. Cal. May 15, 2017). But when viewed in the context of a "Diet Dr Pepper" label, it is not likely that a reasonable consumer would interpret "diet" in the manner Becerra suggests.

Becerra selectively provides definitions for "diet," claiming that it refers either "to weight loss, or to other health benefits resulting from a special or limited selection of food or drink." TAC ¶ 13. In the soft drink context, reasonable consumers could infer that "diet" soft drinks have relatively less sugar or calorie levels than regular soft drinks. This is evident in several of the same dictionary links that Becerra cites in her TAC, which include "diet" as a modifier of "soda" or "soft drink." For example, Cambridge Dictionary defined the adjective "diet" as "containing much less sugar than usual and often sweetened artificially, or containing less fat than usual," as in the example, "diet soda;" and Oxford Dictionaries defined the adjective "diet" as "with reduced fat or sugar content," again providing the example of "diet soft drinks." *See, Diet (adj.)*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/diet (last visited July 4, 2018); *Diet (adj.)*, Oxford Dictionaries, https://en.oxforddictionaries.com/definition/diet (last visited July 4, 2018).

Becerra argues that there is no reason consumers cannot believe "diet" means assisting with weight loss and that, as Dr Pepper argues, it has reduced sugar and calories. Other federal district courts have addressed the same claim raised here, and at least one has thoroughly

7

explained why dictionary definitions for "diet" do not communicate weight loss or weight maintenance in the narrow context of diet soft drinks.[1] The Hon. Paul A. Engelmayer dismissed the plaintiffs' consumer protection claims because even if "diet" sometimes means assisting with weight loss, in the context of soft drinks it is unambiguous that it signals only a soft drink's relatively less sugar or calories when compared to its regular counterpart. *Pepsi-Cola Co.*, 2018 WL 2269247, at *8–9. The court analyzed dictionary definitions for the term "diet" and found that reasonable consumers understand diet "to make—at most—a relative health claim in comparison to the non-diet variant of the same brand." *Id*. at *9. The exact definitions addressed in that case are different than the ones Becerra provides here, but the conclusion is the same. As I explained in my prior Order, it is not plausible that reasonable consumers would look at "Diet Dr Pepper" as associated with weight loss, separate and apart from the specific context of the product. Instead consumers would view that "Diet Dr Pepper is a 'diet' product relative to regular Dr Pepper." Order at 10.

Becerra then asserts that the definitions for "diet" suggesting weight loss actually align with the views of reasonable consumers because of the survey data in the TAC. *See* Opp. at 9. I address the consumer survey later in this Order, but it does not bolster Becerra's interpretation of the dictionary definitions. Consumers could actually believe that "diet" soft drinks lead to weight loss or do not affect weight gain, but this communicates nothing more than a belief consistent with the appropriate context: that consuming diet soda has weight loss or weight maintenance benefits only relative to the same brand's regular soft drink or when combined with other diet and exercise. The fact remains that "[n]othing on the label, packaging, or advertising of Diet Dr Pepper makes the claim or even suggests that the product will assist in weight loss or healthy weight

---

[1] In another case, brought by the same plaintiff's counsel, the court dismissed the consumer protection claims. *See Excevarria v. Dr. Pepper Snapple Group, Inc.*, No. 17 CIV. 7957 (GBD) (S.D.N.Y. April 28, 2018) (Dkt. No. 54). The Hon. George B. Daniels, in an extensive colloquy with counsel, questioned whether "diet" could be defined as communicating weight loss because the NLEA did not impose a definitional requirement on the term when it exempted its use in products before 1989 so long as they were not false or misleading. *See* Transcript of Proceedings, *Excevarria v. Dr. Pepper Snapple Group, Inc.*, No. 17 CIV. 7957 (GBD) (S.D.N.Y. May 2, 2018) (Dkt. No. 56). Ruling from the bench, the court concluded that "[t]he word 'diet' does not solely represent claims with regard to the loss of weight or the gain of weight by its use." *Id*. at 82.

management," in the absence of other changes to diet or lifestyle. Order at 10. The dictionary definitions in the TAC do not plausibly establish that reasonable consumers could be misled by the label "Diet Dr Pepper."

### 2. Print and Video Advertisements

The TAC also relies on several of defendant's print and video advertisements from as early as the 1970s to show the "messaging" Dr Pepper used conveying a misleading understanding that Diet Dr Pepper will assist in weight loss and healthy weight management. Opp. at 8; *see* TAC ¶¶ 17–23, 27–32. Dr Pepper responds that the majority of these advertisements are irrelevant, since Becerra did not see them personally, they are beyond the statute of limitations and not independently actionable, and many are truthful advertisements that Diet Dr Pepper is "sugar free." I agree that the advertisements are unhelpful because they fail to address whether reasonable consumers would plausibly be deceived by the label on "Diet Dr Pepper."

Becerra contends that the advertisements are significant to demonstrate the reasonableness that consumers interpret "diet" as a product that will assist with weight loss or maintaining weight. But the cases Becerra relies on discuss how non-label statements not personally viewed by plaintiffs could nonetheless be relevant to defendant's knowledge for punitive damages or materiality at class certification. *See, e.g.*, B*arber v. Johnson & Johnson Co.*, 2017 WL 2903255, at *9 (C.D. Cal. Apr. 4, 2017) (finding that advertisements not personally relied upon are still relevant for class certification or punitive damages); *Musgrave v. ICC/Marie Callender's Gourmet Prod. Div.*, 2015 WL 510919, at *11 (N.D. Cal. Feb. 5, 2015) (same); *Krommenhock v. Post Foods, LLC*, 255 F. Supp. 3d 938, 949 n. 12, 969 n. 37 (N.D. Cal. 2017) (same). They are inapposite to whether Becerra's allegation that the term "diet" in "Diet Dr Pepper" is plausibly misleading. *See* Opp. at 6–8.

The advertisements can be summarized as follows. The sugar free Dr Pepper advertisements of the 1970s and 1980s used the phrase, "tastes fattening but it's not." *Id*. at ¶¶ 17–18. In one advertisement, a woman rejects offers of water and champagne for sugar free Dr Pepper. *Id*. at ¶ 20. In another, the ad shows a bikini-clad woman with the text, "[j]ust keep sipping, watch what you eat, and pretty soon you'll start looking better and better too." *Id*. at ¶ 22.

9

Diet Dr Pepper used the catchphrase "the taste we've been missing," and "throw your diet a curve" in its 1980s advertisements as well. *Id*. ¶¶ 27–28. In the more recent advertisements cited in the TAC from the 1990s and 2000s, Diet Dr Pepper claims it "tastes more like regular Dr Pepper." *Id*. ¶¶ 29–32.

None of the advertisements in the TAC amounts to a promise that Diet Dr Pepper alone assists in weight loss or weight management. The advertisements suffer from the same issue identified with the definitions, which is that they convey at most beneficial effects relative to regular soft drinks. More importantly, the advertisements themselves do not explain why the "Diet Dr Pepper" label is deceptive by virtue of the term "diet" alone. Becerra is not asserting any claim based on the advertisements, and the cases she cites to suggest their significance is misplaced. Since the advertisements are irrelevant to the issue here of whether the term "diet" on the label of Diet Dr Pepper is plausibly misleading, they do not help cure the deficiencies in the complaint.

### 3. American Beverage Association Articles

Becerra's TAC also relies on two 2014 American Beverage Association articles that supposedly confirm the industry's own marketing to consumers that "diet" is more than just a calorie-free soft drink. TAC ¶ 36. Contrary to Becerra's interpretation of the articles, they do not make any more plausible a showing that reasonable consumers would associate "Diet Dr Pepper" with weight loss based on the label itself.

The first American Beverage Association webpage, containing a short paragraph article, poses the question to consumers, "[d]id you know that diet beverages can help you lose weight?" TAC ¶ 35; *see* Good News About Diet Beverages!, https://www.ameribev.org/education-resources/blog/post/good-news-about-diet-beverages/ (last visited August 5, 2018). The article links to their study and another article explaining the study, where those who drank diet beverages over twelve weeks lost four pounds more than those who drank water. *Id*. The second article also poses a question, "[d]id you know that diet soft drinks can be an effective tool for weight loss?" TAC ¶ 36; *see* How About A Diet Soda?, https://www.ameribev.org/education-resources/blog/post/how-about-a-diet-soda/ (last visited August 5, 2018). This article makes it

clear that "the key to maintaining a healthy weight is balancing calories consumed with calories burned." *Id.*

Neither article shows that it is plausible for consumers to be misled by the "diet" label. Rather, in one of the links on the first article, it states that the cited study involved journaling meals eaten and "intensive coaching on successful techniques for weight loss." Diet Soda Drinkers May Lose More Weight In the Short Term, https://www.upi.com/Health_News/2014/05/27/Diet-soda-drinkers-may-lose-more-weight-in-the-short-term/1731401205513/?spt=sec&or=hn (last visited August 5, 2018). The second study is explicit that diet can be beneficial when counting calories, amounting to a claim that it has fewer calories relative to its regular soft drink counterpart. At most, these articles merely support the view that the Hon. William H. Alsup in this District and I share that "a reasonable consumer would simply not look at the brand name Diet Coke and assume that consuming it, absent any lifestyle change, would lead to weight loss." *Coca-Cola Co.*, 2018 WL 1070823, at *3; *see also* Order at 10 ("diet soft drinks are simply lower calorie or calorie-free versions of their sugar-laden counterparts.").

Becerra's addition of the American Beverage Association articles do not help her complaint, and do not make it any more plausible that reasonable consumers would believe "diet" simply by being on the label of "Diet Dr Pepper" would lead to weight loss without making other lifestyle changes to lose or maintain weight.

### 4. Becerra's Survey Results

Finally, Becerra includes the results of an April 2018 survey of 400 California and 400 nationwide consumers that her counsel represented during the hearing was commissioned from a survey expert. TAC ¶ 42. Becerra argues that the survey confirms reasonable consumers understand "diet" to communicate weight loss or at least not weight gain. According to Becerra, because "diet" is displayed prominently in the "Diet Dr Pepper" label, consumers are misled by the term. TAC ¶ 43.

The survey appears to have asked four questions, or leads to four distinct categories of responses to questions not provided with the complaint: (i) do you expect soft drinks labeled "diet" to help you lose weight; (ii) do you expect soft drinks labeled "diet" to help you

11

maintain/not affect your weight; (iii) do you expect soft drinks labeled "diet" will make you gain weight; or (iv) do you not have an expectation of what "diet" will do to your weight. TAC ¶ 42. In the survey of 400 California consumers, 12.5 percent expected diet soft drinks to help them lose weight, and 63.3 percent expected diet to help them maintain weight, or at least not affect their weight. TAC ¶ 42. Nationwide consumers were similar. *Id*.

Dr Pepper contests the results and significance of the survey becauase it appears in the complaint without reference to methodology, what questions were asked, or who administered it. Dkt. No. 61 at 16 (citing *Podpeskar v. Dannon Co., Inc.*, No. 16-CV-8478 (KBF), 2017 WL 6001845, at *4 (S.D.N.Y. Dec. 3, 2017) (finding arguments based on personal beliefs and surveys were conclusory)). Becerra responds that weighing evidence is inappropriate on a 12(b)(6) motion, assuming for purposes of the motion that well-pleaded allegations are true, *see Usher*, 828 F.2d at 561, and that her survey methodology must be taken as true on a motion to dismiss, citing *Shalikar v. Asahi Beer U.S.A., Inc.*, 2017 WL 9362139, at *7 (C.D. Cal. Oct. 16, 2017) ("the Court must presume [survey data as] truth on a motion to dismiss, even if a defendant has raised colorable arguments as to the reliability of the survey methodology.").

*Shalikar* does not bear the weight Becerra puts on it. In that case, the court found consumer claims were plausible based on allegations about the "words, pictures, [and] diagrams" on the product's packaging, and not based on the survey alone. *Shalikar*, 2017 WL 9362139 at *7. The court in *Naimi v. Starbucks Corp.*, No. 17-cv-6484, ECF No. 39 at 12, n. 4 (C.D. Cal. June 27, 2018), recently pointed out this distinction and rejected the presumption of truth for survey data because the complaint in *Naimi* lacked other plausible allegations that could permit a reasonable inference a product is misleading.

Here, the complaint resembles *Naimi* in its lack of other plausible allegations supporting a reasonable inference that Diet Dr Pepper is misleading. As already discussed, the dictionary definitions, the print and video advertisements, and the American Beverage Association articles, do not support a plausible claim that Diet Dr Pepper was false or misleading. Following the reasoning in *Naimi*, the unsupported survey would only signify a possible consumer view but not a plausible one. *Naimi*, No. 17-cv-6484, ECF No. 39 at 12.

12

There are additional problems with the survey, even taken as true, that prevent me from finding it establishes reasonable consumers would be misled by the "Diet Dr Pepper" label. The survey results do not challenge the view that reasonable consumers believe "diet" soft drinks offer relatively fewer calories or fat compared to regular soft drinks. Without alleging facts that can counteract this health claim, consumer expectations that "diet" soft drinks will help them lose or maintain weight simply reinforce that reasonable consumers believe diet soft drinks can lead to weight loss or maintaining weight *relative* to regular soft drinks. In addition, the survey's word choice, asking whether drinking diet will "help" with weight loss or if it will "make" consumers gain weight, is not as dispositive of a reasonable consumer's beliefs. A reasonable consumer would know that consuming diet products has an impact on weight to the extent weight loss is about calorie-counting and that they need to combine their consumption with other dietary decisions and exercise. The survey does not challenge this understanding of the "diet" soft drinks either.

For these reasons, the survey fails to demonstrate a shift in what reasonable consumers would believe when purchasing "Diet Dr Pepper." It is not a sufficient allegation that reasonable consumers would be misled by the term "diet."

**B.  Becerra's Contention that Aspartame Causes Weight Gain is Implausible**

Separate from whether the term "diet" on the label of "Diet Dr Pepper" would mislead a reasonable consumer, Becerra also makes a factual claim that aspartame actually causes weight gain, which makes the diet soft drink label false. The previous complaint included scientific studies, but it lacked a single study showing causation rather than the correlation between aspartame and weight gain. Becerra includes more studies in the TAC but she continues to insist that causation is not the pleading requirement because "unequivocal proof of causation" does not always exist. Opp. at 11. I agree that proving causation is not the standard. As I explained in my prior Order, rather than prove causation outright, Becerra "must nonetheless plausibly allege it." *Id*. She fails to do so with the additional studies in the TAC.

The FDA regulates the labeling of products with aspartame; it has concluded that aspartame may be safely used in food under certain conditions. 21 C.F. R. § 172.804.

13

Nevertheless, aspartame is undergoing continued scrutiny: Becerra provides studies showing that aspartame may increase the risks of weight gain and disease. But she errs when she contends that these studies sufficiently establish the plausibility of her claims.

Once again, decisions in similar cases are informative of why Becerra's studies are insufficient. In *Coca-Cola Co.*, the complaint relied on thirteen studies, but in all the studies "the question of causation, rather than correlation, remain[ed] undetermined." 2018 WL 1070823, at *4. The studies acknowledged their own lack of causation evidence, and could only raise concerning conclusions about the aspartame associations drawn from their data. *Id*. The court required a showing that the diet product could cause weight gain to "overcome the otherwise sensible view of reasonable consumers that Diet Coke consumption alone will not lead to weight loss." *Id*. In *Pepsi-Cola Co.*, the court dismissed the complaint on similar grounds because the fourteen studies plaintiffs provided actually disclaimed causation, rather than show diet soda could lead to weight gain. 2018 WL 2269247, at *10. The court summarized many of the studies and found that some of them left the question of causation open, while others concluded there may be no causation between artificial sweeteners and weight gain. *Id*. at *10–11.

Here, Becerra was directed that "if plaintiff provided credible studies that support that Diet Dr Pepper or aspartame causes weight gain, that showing would be sufficient." Order at 11. The new studies Becerra included in the TAC still fail to offer a single finding of causation between aspartame or diet soda products and weight gain. *See e.g.*, Palmnas, et al., *Low-Dose Aspartame Consumption Differentially Affects Gut Microbiota-Host Metabolic Interactions in the Diet-Induced Obese Rat*, Oct. 2014, cited in TAC ¶ 46 (finding sweeteners result in excess glucose associated with diabetes); Von Poser Toigo, et al., *Metabolic and Feeding Behavior Alterations Provoked by Prenatal Exposure to Aspartame*, at 168-74, Apr. 2015, cited in TAC ¶ 47 (finding offspring of animal mothers consuming aspartame have greater risk of increased glucose); Azad, et al., *Association Between Artificially Sweetened Beverage Consumption During Pregnancy and Infant Body Mass Index*, at 662-70, July 2016, cited in TAC ¶¶ 47–48 (finding prenatal consumption of aspartame predisposes offspring to obesity); Chia, et al., *Chronic Low-Calorie Sweetener Use and Risk of Abdominal Obesity among Older Adults: A Cohort Study*, Nov. 2016,

14

cited in TAC ¶ 52 (finding artificial sweetener is associated with weight gain). Leaving the causation question open is not enough. *Pepsi-Cola Co.*, 2018 WL 2269247, at *10–11.

These studies identify associations with weight gain and diabetes, greater risks for increased glucose, and predispositions to negative health effects from artificial sweeteners. But as I repeat from my prior order, "correlation is not causation, neither for purposes of science nor the law." Order at 11. None of the studies supply the plausibility of a causal link between Diet Dr Pepper and weight gain. Becerra's TAC does not allege that "diet" misleadingly conveys a lower risk of weight gain, and the studies on risks of weight gain or associated health risks due to aspartame at best support a different claim than the one alleged in the TAC.

I agree with the other diet soft drink cases I have discussed in this Order that the studies Becerra cites do not cross the threshold from allegations of correlation to causation. Continued scientific research on aspartame may reach the conclusions Becerra would like to draw, but today, the TAC lacks a plausible claim to relief. Her consumer protection claims are DISMISSED.

## III. BREACH OF EXPRESS AND IMPLIED WARRANTY

Becerra's breach of express and implied warranty claims fail on the same grounds that the consumer protection claims fail. The TAC does not sufficiently allege that Diet Dr Pepper misrepresented a promise to consumers that they could lose weight or maintain a healthy weight by using the product. The term "diet" labeled on Diet Dr Pepper does not create an express or implied warranty to consumers that the product will lead to weight loss or healthy weight management. Dr Pepper is correct that for these reasons, Diet Dr Pepper "conform[s] to … the affirmation of fact made on the … label." Cal. Com. Code § 2314(f). Plaintiff's express and implied warranty claims are DISMISSED.

15

**CONCLUSION**

For the foregoing reasons, the Motion to Dismiss is GRANTED without leave to amend and the case is dismissed. Given that this was Becerra's fourth attempt to state a claim, her counsel agreed at the hearing on defendant's motion that further efforts to amend would be futile.

**IT IS SO ORDERED.**

Dated: August 21, 2018

William H. Orrick
United States District Judge